515 So.2d 780 (1987)
LOUISIANA STATE BAR ASSOCIATION
v.
Sanford KRASNOFF.
No. 86-B-1598.
Supreme Court of Louisiana.
November 30, 1987.
*781 Thomas O. Collins, Jr., G. Fred Ours, New Orleans, Gerard F. Thomas, Jr., Natchitoches, Roland J. Achee, Shreveport, Robert J. Boudreau, Lake Charles, Robert M. Contois, New Orleans, Frank J. Gremillion, Baton Rouge, Carrick R. Inabnett, Monroe, Harvey Lewis, New Orleans, Alfred S. Landry, New Iberia, Philippi P. St. Pee, Metairie, for applicant.
Sanford Krasnoff, New Orleans, for respondent.
DENNIS, Justice.
This court has jurisdiction of this disciplinary proceeding against a disbarred attorney. Under its inherent judicial authority established by the separation of powers and its original jurisdiction, this court has the supreme authority to regulate the practice of law. La. Const. 1974, art. II §§ 1, 2; art. V § 5(B); See, Leenerts Farms, Inc. v. Rogers, 421 So.2d 216 (La. 1982); Singer, Hutner, Levine, Seeman & Stuart v. Louisiana State Bar Association, 378 So.2d 423 (La.1979); Saucier v. Hayes Dairy Products, Inc., 373 So.2d 102 (La.1979); Louisiana State Bar Association v. Edwins, 329 So.2d 437 (La.1976); Ex Parte Steckler, 179 La. 410, 154 So. 41 (1934); Meunier v. Bernich, 170 So. 567 (Orl.App.1936). Moreover, this court's prerogative to decide according to its rules whether a person shall be admitted to the bar, disciplined as an attorney, disbarred, or reinstated as a lawyer, is essential to its ability to govern the practice of law. See LSBA Arts. of Incorp., art. 14 § 7; art. 15 §§ 6, 12(b)(1); LSBA v. Krasnoff, 502 So. 2d 1018 (La.1987). Consequently, even when a person has been expelled from the legal profession, because of the propensity of disbarred lawyers to seek readmission, this court will permit the bar association to prove up additional grounds for his discipline or disbarment in order to make a record to assist in evaluating that person's moral character in the event he applies for readmission. LSBA v. Krasnoff, supra. Cf. ABA Standards for Imposing Lawyer Sanctions § 4.11, Commentary (1986).[1] *782 Further, consideration of the actual or potential injury caused the client in such a case by the former lawyer's misconduct reinforces the concept that a basic purpose of lawyer discipline is protection of the public. LSBA v. Krasnoff, supra; Standards § 4.11, Commentary.
The misconduct of Sanford Krasnoff, the respondent, in this case follows the same pattern as that described in his two previous disciplinary proceedings. He was employed by Mrs. Berrenise Madere to enforce her personal injury claim arising from a vehicular accident in August, 1976. He or his associate timely filed suit in her behalf against the responsible persons, and on December 11, 1978 the respondent personally settled her claim for $7,500. Following his usual procedure, he used a power of attorney previously obtained from his client to endorse the insurance company draft and deposit the proceeds in his general office account. He did not have a client's trust account for the preservation of this client's funds. He did not notify his client of the settlement, and the insurance company did not ask for a release from her.
Mrs. Madere, who was unaware that her case had been settled, continually made demands over the next seven years that the respondent take action to enforce her claim. The respondent either refused to return her phone calls or promised that he would work toward a settlement. Once when Mrs. Madere visited his office he told her in front of her sister that he would have some money for her soon. On this and other occasions the respondent deliberately led Mrs. Madere to believe that he had not recovered any money for her. Indeed, it was not until two days prior to his hearing before the Disciplinary Committee that respondent acknowledged possession of the settlement proceeds by offering to allow her to pick up her net share at his office. It was not until the hearing itself that the respondent finally paid her 2/3 of the recovery, some seven years and three months late and without interest.
The respondent conceded that he received the settlement proceeds on December 11, 1978, placed them in his general office account, and did not deliver to his client the funds she was entitled to receive until February 21, 1986, at the committee hearing. Yet he admitted to no wrongdoing. Instead, he claimed that he promptly notified Mrs. Madere of the settlement, and that she approved the settlement but asked him to keep the money for her. He contended that she feared that members of her family would take it from her. The respondent testified that he withdrew the funds to which Mrs. Madere was entitled in cash from his general office account, kept this cash in his safe for some seven years, and converted this cash to smaller bills just prior to the disciplinary hearing. The respondent produced onion skin copies of several letters he claimed that he had sent to Mrs. Madere discussing the settlement and her request that he keep her money because of her family and mental problems. He explained Mrs. Madere's persistent phone calls and her visit to his office as being due to her mental confusion rather than to her desire to collect on her claim. He testified that she irrationally asked him to file a groundless suit against an ambulance driver who responded to a call in connection with her accident although that driver did not injure her in any way. He did not deny promising to obtain money for Mrs. Madere in the presence of her sister in his outer office. However, he claimed that Mrs. Madere came into his private office to see him alone. Thus, he implied that he had merely gone along with her concealment of the settlement of her case from her sister and other family members.
Mrs. Madere testified consistently and steadfastly that although respondent had estimated that he could settle her case for $3,000, he concealed the $7,500 settlement from her until two days before the hearing and that she never received the letters he claimed he sent her. She strongly maintained that she had nothing to fear from her family, many of whom had assisted her *783 financially, and that she continually demanded action from the respondent over the years rather than asking him to retain her money. She testified that she desperately needed the funds during those years because she was forced to work while in ill health to support her family, including an invalid daughter and her husband who suffered a stroke and later died. Mrs. Madere's sister testified and corroborated her testimony. She said that during those years Mrs. Madere was not aware that the case had been settled, that she had nothing to fear from her family, that she needed the money badly and that she had no reason to refuse delivery of her funds. The sister confirmed that she was very close to Mrs. Madere, that she drove her places frequently, that she had visited the attorney's office with her, and that she had been present when the respondent promised to recover some money for Mrs. Madere soon.
The commissioner believed Mrs. Madere and her sister and did not credit the respondent's testimony. The committee likewise found the respondent's explanation of his conduct to be incredible. We find the evidence clear and convincing that the respondent committed disciplinary rule violations by failing to maintain a client's trust account, failing to promptly notify his client of his receipt of her funds, failing to promptly deliver them to her, and failing to maintain complete records and to render appropriate accounts to his client of funds received. DR 9-102(A) & (B), Louisiana Code of Professional Responsibility.[2] Further, we find by clear and convincing evidence that he actually converted Mrs. Madere's funds to his own use and concealed this fact from his client for over seven years.
Mrs. Madere does not seem to be mentally deranged or irrational according to her recorded testimony. None of the officials who heard and saw her testify considered her testimony unreliable. Therefore, considering Mrs. Madere's ill health and financial need, we find it highly unlikely that she knowingly and voluntarily allowed her settlement funds of almost $5,000 to remain in her attorney's safe for over seven years without asking for any part of it or without complaining that her money was not drawing interest. Equally preposterous is the respondent's argument that Mrs. Madere and her sister, elderly women of apparently modest education, without the aid of counsel testified with steady and harmonious consistency to a fabricated or insane story despite his cross examination and the questioning of the commissioner and a member of the committee. Only slightly less incredible is his contention that as a reasonably competent lawyer he was helpless to devise any means to preserve his client's funds and make them available for her medical expenses and other desperate needs. Finally, although the present violation occurred before the infractions underlying his previous sanctions, they have all of the earmarks of the ingrained pattern of conduct which emerged in the later violations.
In his report, the commissioner questioned why an attorney would hold nearly $5,000 in a safe for over seven years but found no direct evidence in the transcripts that respondent used the funds belonging to Mrs. Madere for his personal use. However, we find that the Bar Association has proved by clear and convincing evidence or to a high probability that respondent converted the funds to his own use. When an attorney relies upon a "black box" defense, viz., that he kept a client's funds secretly but securely in a private safe or other similarly unregulated depository, the likelihood of actual embezzlement is so great, and the policy of protecting clients from such risks is so strong, that it should be presumed that the attorney is guilty of embezzlement unless he successfully carries both the burden of going forward with the evidence and the burden of persuasion otherwise. LSBA v. *784 Krasnoff, 488 So.2d 1002 (La. 1986); LSBA v. Whittington, 459 So.2d 520 (La.1984).
Rather than producing any evidence to overcome the presumption of conversion, the respondent introduced evidence making conversion even more highly probable. When respondent delivered the funds to Mrs. Madere at the Committee Hearing, he admitted that it was not the same money he had placed in his safe for her, although he testified that he had changed that money the day before for smaller bills. Furthermore, respondent admitted that he kept no records or documentation for the safe, the dates of deposits or withdrawals, nor any statement showing how much was in the safe or to whom it belonged.
In determining the appropriate sanction after a finding of lawyer misconduct, we will consider the factors recommended by the ABA Sanctions Standards, viz. (a) the duty violated; (b) the lawyer's mental state; (c) the actual or potential injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors. Standards § 3.0. Although we will not actually impose a sanction on the disbarred attorney in this case, a determination of the gravity of his violation will be relevant in the event he seeks readmission.
The respondent in this case violated his duty to preserve his client's property. Under our cases and the Standards, disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client. LSBA v. Hinrichs, 486 So.2d 116 (La.1986); LSBA v. Hickman, 471 So.2d 696 (La. 1985); Standards § 4.1. Accordingly, we find the respondent's present violations to be among the most serious offenses of this kind because we have found by clear and convincing evidence that he knowingly converted his client's property and that the injury caused to the client was substantial, including both loss of interest on her funds and deprivation of her funds for a protracted period during which she was in necessitous circumstances.
We find present in the respondent's case most of the aggravating factors that according to the Standards justify an increase in the degree of appropriate discipline: (1) prior disciplinary offenses; (2) dishonest or selfish motive; (3) a pattern of misconduct; (4) multiple offenses; (5) submission of false evidence during the disciplinary process; (6) refusal to acknowledge wrongful nature of conduct; (7) vulnerability of the victim; (8) substantial experience in the practice of law; (9) indifference to making restitution. The only factor missing in this case is bad faith obstruction in the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency. Standards § 9.22. We have included indifference to making restitution because respondent has not offered to repair any of the damage done by his misconduct such as, for example, the loss of interest on her funds for over seven years.
Respondent has not produced evidence of any of the mitigating factors set forth by the Standards, except for the imposition of other sanctions in his previous cases. Standards § 9.32. Most notably absent from this case is any evidence of remorse. Id.
Because the violations in this case occurred before the breaches which led to respondent's previous disbarment and the extension of the delay period before his possible readmission, and form a part of the same pattern of misconduct, we will not again disbar respondent or extend the mandatory delay of his readmission application. However, for the reasons assigned, respondent is adjudged guilty of additional violations that warrant disbarment and which shall stand on his record for consideration in determining whether he should be readmitted to the practice of law. Additionally, because Mrs. Madere was wrongfully deprived of her money for over seven years, respondent is ordered to pay her legal interest on her funds from the date that he received them until the date he delivered them to her. Payment shall be due immediately and also shall be a condition of respondent's readmission to the bar. Cf. Standards §§ 2.8 and 2.10, Commentary. *785 All costs of these proceedings are assessed against respondent. It is so ordered.
DECLARATION OF ADDITIONAL VIOLATIONS WARRANTING DISBARMENT.
NOTES
[1] We have adopted portions of the ABA Standards for Imposing Lawyer Sanctions in this opinion as guidelines supplementary to our rules and decisions. These standards are referred to hereinafter as "Standards".
[2] See also, Rule 1.15, Model Rules of Professional Conduct of the Louisiana State Bar Association. The amendment to Article XVI of the Articles of Incorporation of the Louisiana State Bar Association, being now the Model Rules of Professional Conduct became effective January 1, 1987.