553 So.2d 807 (1989)
LOUISIANA STATE BAR ASSOCIATION
v.
Earl T. LINDSAY.
Nos. 87-B-2375, 88-B-0170, 88-B-0171 and 88-B-1591.
Supreme Court of Louisiana.
December 11, 1989.
*808 Thomas O. Collins, Jr., New Orleans, Cheri A. Cotogno, Gerard F. Thomas, Natchitoches, Roland J. Achee, Shreveport, Robert J. Boudreau, Lake Charles, Robert M. Contois, New Orleans, Frank J. Gremillion, Baton Rouge, Carrick R. Inabnett, Monroe, Harvey Lewis, New Orleans, Alfred S. Landry, New Iberia, Philippi P. St. Pe', Trevor G. Bryan, Elizabeth A. Alston, New Orleans, Christine Lipsey, Baton Rouge, and Edmund McCullam, for applicant.
Earl T. Lindsay, respondent pro se.

*809 DISCIPLINARY PROCEEDING
WATSON, Justice.
Acting through its Committee on Professional Responsibility, the Louisiana State Bar Association has filed four petitions for disciplinary action against attorney Earl T. Lindsay with the Louisiana Supreme Court.[1] Altogether, these petitions charge Lindsay with professional misconduct in ten separate matters and seek disbarment or suspension for at least three years.
The petitions culminated a long fact-finding process that began in 1983 when the LSBA received its first complaint about Lindsay. The LSBA sent Earl T. Lindsay a copy of that and each successive complaint, requesting written responses. Despite promises to comply, Lindsay provided written responses in only two instances. The LSBA conducted four investigatory hearings at which complainants were available for cross examination. Lindsay failed to attend two of the four hearings. Commissioner Margaret LeBlanc was appointed, and Lindsay attended the Commissioner's hearing on March 6, 1989. He did not, however, except to the Commissioner's Report, oppose the LSBA's four petitions, or appear for oral argument before the Louisiana Supreme Court.
Notwithstanding Lindsay's neglect of his own defense, it is the responsibility of this court to conduct an independent review of the record and determine whether the LSBA established proof of misconduct by clear and convincing evidence. LSBA v. Edwins, 329 So.2d 437, 441 (La. 1976).
Admitted to the bar in 1978, Earl T. Lindsay worked in an indigent defender program and established a solo practice. Lack of attention to financial records and blind reliance on his accountant led to trouble with the IRS and complaints from two clients about NSF checks. Other complaints followed, based on neglect of legal matters, inadequate communication with clients, offensive remarks, and failure to return unearned fees.

Harry Thompson
The first complaint came from Harry and Walterine Thompson. Lindsay arranged a settlement with the Thompsons' UM carrier in September of 1982 and issued the Thompsons a check for $2,935.53. Lindsay advised his clients to hold the check a few days, as it was drawn against an insurance company draft which had to clear. When Walterine Thompson deposited the check in their savings account a few days later, it was returned for insufficient funds. She contacted Lindsay, who assured her that the check was good without realizing that the check had been dishonored. The Thompsons kept the check for almost a year, thinking that Lindsay would take care of the matter. Not until the bank marked a $2,935.53 deduction in their passbook did the Thompsons understand that the money had never gone into their account.[2]
When Harry Thompson went to confront Lindsay about the missing funds, the lawyer was not available. Lindsay never called Thompson about the visit or returned his subsequent telephone calls. Finally, Walterine Thompson spotted Lindsay in a gas station. He told her to give him the NSF check so that he could correct the situation, but he did nothing. Finally, the Thompsons turned to another attorney for help. After failing to contact Lindsay, this attorney sent a complaint to the LSBA.
At a hearing on May 3, 1985, Lindsay claimed that he relied on his accountant to handle his financial matters and was unaware the Thompsons had not received their money. He denied receiving their telephone messages. When Walterine Thompson spoke to him at the gas station, Lindsay was unable to make the check good immediately because the accountant *810 had left his financial affairs in chaos.[3] Lindsay offered to reimburse the Thompsons in two installments, but they wanted all their money at once. When the LSBA became involved, Lindsay decided to wait and let the Committee resolve matters.[4] He brought a cashier's check for the Thompsons to the hearing. Lindsay admitted that he had not segregated the clients' money from his own money and that he had not maintained a sufficient amount in his trust account.

Cheryl M. Jones
Aetna issued a settlement check to Lindsay and his client, Cheryl M. Jones, dated February 27, 1985. Lindsay negotiated the check, obtained Jones' signature on a release, and issued her an NSF check for $1,698.40. After the check was returned by Jones' bank, Lindsay advised her to take it to his bank; his bank also refused to honor the check. Lindsay promised Jones that he would bring a cashier's check to her home, but did not show up or respond to her telephone calls. Jones wrote to the LSBA on April 8, 1985, and Lindsay paid her ten days later. Lindsay ascribed his delay to the long hours he kept in the indigent defenders' program. Bank records showed that the funds in Lindsay's trust account were insufficient when the check was dishonored.

Bessie Jones
In 1982, Bessie Jones, an illiterate woman in her eighties, gave Earl Lindsay $500 for title work on two pieces of property in Scotlandville which she wanted to sell. Lindsay never cleared her titles or let her know what he had done to resolve her problem. Although she visited and called his office repeatedly, he avoided her. Only by making an appointment under her daughter's married name did she manage to see him. Bessie Jones asked Lindsay to return her money and documents so that she could retain another attorney. Lindsay returned nothing but a will which she did not want or need. Mrs. Jones' granddaughter wrote the LSBA on her behalf.
Lindsay did not attend the hearing on Bessie Jones' complaint. At the Commissioner's hearing, he explained that his secretary had received the notice while he was out of the office with a bad back and she did not mark the hearing on his calendar. Lindsay claimed that he had made two trips to Baton Rouge to research the title, but the information furnished was inadequate to complete the work. He alleged that Bessie Jones expected him to "make something up"[5] to fill the missing links in her chain of title. Lindsay felt he had earned the $500 with his trips and interviews with various relatives. He denied that he had failed to communicate with Mrs. Jones.

Joann Theard Cross
Joann Theard Cross paid Earl Lindsay $450 to obtain a legal separation and divorce. He began representing her in September of 1985, but never concluded the matter. She fired him and wrote a letter to the LSBA about his profanity and his refusal to return her papers until she paid him more money. Cross later withdrew this complaint and gave Lindsay another chance to handle her affairs. Seven months later, the LSBA received a second letter from Cross, charging that she had not received alimony timely because Lindsay had not submitted a court order for signature. Also, Cross tried unsuccessfully to obtain copies of court orders and *811 confirmation of medical coverage so that she could be admitted to the hospital for surgery. Lindsay did not return her calls, make copies of the orders, or keep appointments with her. At the last moment, Lindsay made a telephone call to the hospital to certify that Cross was covered by her estranged husband's insurance policy. Lindsay's dilatory practices caused delay in her receipt of alimony, stress, and financial hardship.
At the Commissioner's hearing, Lindsay said he had filed a petition for separation and divorce and had obtained injunctions, alimony pendente lite of $200 a month, insurance coverage, and use of the family domicile. He estimated that he had gone to court for Cross on five different occasions and had talked to her for hours about her personal problems. Because Cross was reluctant to discuss certain matters in open court, they decided to ask for a divorce on the basis of living separate and apart for one year. Lindsay did not supply a written response to the Commissioner because he expected Cross to withdraw her second complaint. He described her as an unhappy woman who took her frustrations out on him.

Thomas E. Loehn
Attorney Thomas E. Loehn, representing Commercial Union Insurance Co., entered into an oral agreement with Lindsay to settle an action pending in Orleans Parish Civil District Court. Loehn sent the settlement funds and documents to clients, Edward Carter, Sr., Rosa Joyce Carter, and Eloise Gilbert Green, but the settlement documents were never executed and returned to Loehn. After trying for more than five months to obtain the completed documents, Loehn notified the LSBA of his problem.
Lindsay was dilatory in complying with the LSBA's requests and the Supreme Court's subpoenas and orders. A formal hearing was rescheduled because Lindsay was suffering from muscle spasms in his back, but Lindsay still failed to attend. Lindsay addressed the charges at the Commissioner's hearing and explained that he had trouble convincing Rosa Joyce Carter to sign the release. He thought that Commercial Union understood the problem because it issued a new draft to this plaintiff. Lindsay believed that he had done nothing unethical since the checks negotiated by Edward Carter and Eloise Green were marked "full release"[6] and he did not pursue further litigation against Commercial Union.

Avery E. Kolb, III
On September 2, 1986, Avery E. Kolb, III paid Lindsay $175 to handle his bankruptcy. Seven months later, Kolb complained that Lindsay had failed to perform any services for him, that his paycheck had been garnished, and that Lindsay refused to return his papers. Kolb offered into evidence a recorded message in which Lindsay blamed a paralegal for the problem; in the tape, Lindsay said that he had fired the paralegal and would reimburse Kolb for any wages that were garnished. Kolb attempted to communicate with Lindsay every day after receiving this message, to no avail. Kolb testified that Lindsay never informed him that his bankruptcy worksheet was incomplete or that Lindsay needed additional information. In addition to the worksheet, Kolb gave Lindsay a paper bag containing bills, IRS returns, and other financial records, which Lindsay was supposed to review with Kolb. Kolb said that he had lost $1,023.13 because of Lindsay, $175 in legal fees and the rest in garnished wages. Kolb requested but did not receive a refund from Lindsay. Kolb retained another attorney, Robert Gunther, who testified that he was unable to speak to Lindsay or to obtain Kolb's papers from Lindsay.
Lindsay testified that he left several messages on Kolb's answering machine, informing his client that he needed additional information. He claimed the dispute resulted from Kolb's desire to exclude a settlement for back wages from the bankruptcy. Lindsay refused on ethical grounds and said he told Kolb to pick up his money and documents, but Kolb never came to get *812 them. This rationale does not, of course, explain attorney Gunther's testimony.

Karen G. Hughes
Karen G. Hughes retained Lindsay on June 26, 1986, to handle bankruptcy and divorce matters for her. She paid him $400. Hughes was satisfied with Lindsay's handling of the divorce case, but complained to the LSBA when he failed to perform any services in the bankruptcy matter. Lindsay had led her to believe that he had filed the bankruptcy papers she had signed. She learned he had not when her paycheck was garnished.
Unable to reach Lindsay, Hughes asked her father, Franklin D. Simms, for help. Simms attempted to speak to Lindsay on her behalf. Lindsay refused to take his calls until Simms pretended to be a prospective client, whereupon Lindsay returned his call in eight minutes. Lindsay told Simms he would return the money. After Simms said that he wanted Lindsay to perform his duties, Lindsay used obscene language and hung up on him.
Lindsay failed to appear for the hearing when Hughes and her father testified. At the Commissioner's hearing, Lindsay said he did not file the bankruptcy papers because Hughes was uncooperative and did not complete the necessary documents. When her paycheck was garnished, Lindsay reimbursed her $62.39.

Ethel Bradford
Ethel Bradford retained Earl Lindsay for the first time in 1983. Satisfied with his representation in her divorce proceeding, she turned to him in a child support matter. Bradford complained that Lindsay neglected to send her a copy of the consent judgment and refused to return her phone calls.
At the hearing, Lindsay claimed that he had performed services on Bradford's behalf, appearing with her in court on April 23, 1986, and entering into a consent agreement. Opposing counsel prepared the judgment, but Lindsay found it unacceptable and returned it for modification. A new judgment was finally signed on February 18, 1987. Lindsay believed that Bradford was upset because: (1) she did not understand why the judge would not grant her all the relief she sought; and (2) she thought that her rights were infringed in a bench conference which she could not hear.

Wilhelmina Vincent
Wilhelmina Vincent retained Lindsay to represent her and her brother, Charles Frilot, in a property matter and paid him $200. Lindsay filed suit in the United States District Court for the Eastern District of Louisiana despite assurances that he would file in the Western District; the case was dismissed for lack of jurisdiction. Although he was paid an additional $1,000 to refile in the Western District, Lindsay took no further action. Vincent attempted to contact Lindsay, but he refused to return her calls.
Lindsay did not appear at the hearing when Vincent testified, but offered an explanation at the Commissioner's hearing. His research indicated that the Vincent/Frilot oil producing property had been lost through foreclosures in 1928 and 1932. He felt he had earned his fee by making numerous trips to see the property in Charenton, Louisiana, commissioning and reviewing research, meeting frequently with various family members, and copying a big box of documents for each family member. Lindsay said he did not keep time sheets, and Vincent never requested an accounting. Lindsay did not provide documents to Vincent's new attorney because he had already copied everything in his files for various family members.

Joseph M. Barre, Jr.
Joseph M. Barre, Jr. engaged Lindsay in a succession matter, in which Barre had been represented by two other attorneys. On the day that Barre, his sister, and his father's widow were to settle his father's estate, Barre contacted Lindsay and requested that he come to the signing. Barre alleged that Lindsay told him he was not getting his fair share of the succession and advised him against signing anything. Barre gave Lindsay $50 and offered more if needed. Barre claimed that Lindsay never *813 settled the succession, neglected his calls, refused to relinquish his files, and told him not to worry about a suit filed against him by the succession's prior attorney.
Lindsay denied that he had advised against signing the documents prepared by the previous attorney. He testified that he had filed a rule on Barre's behalf, but Barre had paid him nothing. Barre fired him because he did not force Barre's stepmother to buy out the children. Lindsay was attempting to pay the previous attorney the money owed by the succession. Lindsay saw no reason to turn his files over to a subsequent attorney because he had already given copies of everything to everyone concerned.

Earl Lindsay's Testimony
At the Commissioner's hearing, Earl Lindsay explained that he had become depressed over his professional situation. Because of his previous accountant, the IRS was auditing him. He had been injured in several automobile accidents and suffered from severe muscle spasms in his back. Wanting to keep his fees low to help poor people, he undertook more legal work than he could perform. As he failed to satisfy everyone and the New Orleans economy declined, his business diminished and disappeared. He closed his office on Carrollton Avenue and practiced out of his mother's home.
Each new complaint increased Lindsay's despair. He became discouraged when his efforts to repay clients, furnish records, or supply explanations in hearings did not satisfy the Bar Association. He said, "I ... began to feel that it didn't matter what I said or what I did or what I provided to the Bar Association.... If I supplied it and it indicated that indeed I had done nothing wrong, I was still going to be punished."[7] Because of depression, Lindsay stopped going to his office on a regular basis and waited days before opening letters from the LSBA. He testified, "I'm almost at the point where I just want it to be over with."[8]

Conclusions
The purpose of disciplinary proceedings is not so much to punish the attorney as it is to protect the courts and the public from unprofessional conduct and to maintain confidence in the judicial system. Sanctions in a particular case depend upon the number and nature of the offenses, the aggravating and mitigating circumstances, and the character of the lawyer involved. LSBA v. Alker, 491 So.2d 1328 (La.1986); LSBA v. Hinrichs, 486 So.2d 116 (La.1986).
Although it is difficult to sort out the truth from the multiplicity of accusations and counter-accusations, certain facts have been established by clear and convincing evidence. Earl T. Lindsay's law practice was in shambles. He did not keep time sheets to justify the fees that he took from clients. He did not keep adequate funds segregated in his clients' trust account. On two occasions, he converted clients' money to his own use. He undertook matters that he was unwilling or unable to complete, but refused to give an accounting or return unearned fees. He neglected his legal responsibilities, made empty promises, and lied to clients about his procrastination. He treated clients with contempt, refusing their pleas for information and cursing them for their persistence. In the Loehn, Kolb and Barre matters, he prevented timely performance by other attorneys. Lindsay's conduct violates DR 1-102,[9] DR 6-101,[10] and DR 9-102[11] of the Code of *814 Professional Responsibility and Rule 1.1,[12] Rule 1.3,[13] Rule 1.4(a),[14] and Rule 1.16[15] of the Rules of Professional Conduct.
Several factors aggravate these violations. Not once throughout these proceedings did Earl Lindsay show remorse or accept responsibility for his mismanagement. Instead, he attempted to shift the blame to his accountant, his secretary, his paralegal, the LSBA, or the clients themselves. He failed to cooperate with the investigation of the complaints against him and was cited several times for contempt in failing to respond to subpoenas.
By his own admission, Lindsay did not segregate client funds and used them for his own purposes. Harry Thompson had to wait three years and eight months for his money and Cheryl Jones had to wait three months. Both clients had to complain to the LSBA to obtain Lindsay's attention. While there is some evidence that Lindsay's accountant caused him problems in the early years of his practice, an attorney must oversee an accountant's work and bear ultimate responsibility for conversion of a client's money. Having realized the inadequacy of his bookkeeping practices in 1983 in the case of the Thompsons, Lindsay was negligent in allowing the same thing to happen in 1985 to Cheryl Jones.
Procrastination can affect clients as disastrously as conversion. Lindsay's delay in securing alimony for Joann Cross caused financial hardship. Unable to pay her bills because of a temporary medical disability, Cross counted on the alimony for her daily expenses and medical care. Lindsay's neglect of Avery Kolb's bankruptcy cost that client over $800 in garnished wages. Lindsay also abandoned Karen Hughes to her creditors.
Although Lindsay performed some services for Wilhelmina Vincent and Bessie Jones, he did not complete the tasks he agreed to perform. It is possible that Vincent had no claim on the property in Charenton and Jones' chain of title was so confused as to make action economically unfeasible.[16] In both instances, Lindsay's duty was to determine the chances of success, convey that information to the clients, and return any unearned fees. See LSBA v. Young, 534 So.2d 948 (La.1988).
*815 Lindsay may have done everything substantively possible for Ethel Bradford. An attorney cannot guarantee a certain outcome in a suit to increase child support. However, his failure to keep her informed and to consult with her about the compromise caused her to believe that she had been cheated by the court and her attorney. Lindsay's subsequent failure to send her a copy of the consent judgment did nothing to allay her suspicions.
Conversion of client funds is a serious offense for which disbarment or suspension is an appropriate sanction. Generally, disbarment is reserved for cases in which one or more of the following factors are present: (1) the lawyer acts in bad faith and intends a result inconsistent with the client's interest; (2) the lawyer commits forgery or other fraudulent acts in connection with the violation; (3) the magnitude or duration of the deprivation is extensive; (4) the magnitude of the damage or risk of damage, expense, and inconvenience caused the client is great; (5) the lawyer either fails to make full restitution or does so tardily under the pressure of disciplinary or legal proceedings. Hinrichs, supra.
The record does not show actual financial harm to Thompson and Jones, aside from the loss of interest. They did not rely on the funds for daily expenses or suffer damage to their credit ratings. However, Lindsay refused to make restitution until complaints were lodged against him. A negligent violation of an attorney's fiduciary duty to his clients may indicate a lack of dedication to the standards of the profession. Hinrichs, supra. Other clients who were harmed by Lindsay's neglect are still waiting for restitution of unearned fees and/or an accounting.
In mitigation, Earl Lindsay's personal problems with his health and his accountant have been weighed. To Lindsay's credit, he served the least privileged members of the community, as evidenced by his participation in the indigent defender program.
The number and nature of Lindsay's violations, the vulnerability of his clients, and his failure to accept blame, as well as his unwillingness or inability to cooperate with the LSBA and this court militate against his continuing in the practice of law. All factors considered disbarment is necessary to prevent further harm to the public and to the legal system.

DECREE
For the reasons assigned,
IT IS ORDERED, ADJUDGED AND DECREED that the name of Earl T. Lindsay be stricken from the roll of attorneys and his license to practice law in the state of Louisiana be canceled. All costs are assessed to Earl T. Lindsay.
NOTES
[1] LSA-Const. 1974 art. V, § 5(B).
[2] Lindsay testified that the Thompsons held the check until August or September of 1983. The Thompsons were not sure when they notified the attorney about the bad check, but they agreed that they had retained the check in their possession. Apparently they did not know that an NSF check could be redeposited.
[3] Willie Mabry, Lindsay's new accountant, corroborated his condemnation of the original accountant. Income tax forms were not filed, ledgers were not kept, books were not balanced. Lindsay claimed that the accountant told him to transfer $3000 from the trust account to the operating account. Additionally, Lindsay thought he was doing so well that he made a $13,000 loan to the original accountant for a computer which would be used to manage his law practice.
[4] Lindsay stated, "My impression was the Bar was going to tell me what I should do, when to do it, that I shouldn't do anything on my own.... I didn't want the Committee to think I had stolen the money and was trying to cover up." Tr. 116-17, Committee Hearing, May 3, 1985.
[5] Tr. 126, Commissioner's Hearing, March 6, 1989.
[6] Tr. 147, Commissioner's Hearing, March 6, 1989.
[7] Tr. 95-96, Commissioner's Hearing, March 6, 1989. Lindsay refers here to two complaints in which he was exonerated of unethical conduct but reprimanded for his delinquency in responding to the Commissioner.
[8] Id. at 99.
[9] DR 1-102(A) provides: "A lawyer shall not ... (4) Engage in any conduct involving dishonesty... or misrepresentation ... (6) Engage in any other conduct that adversely reflects on his fitness to practice law."
[10] DR 6-101(A) provides: "A lawyer shall not... (2) Handle a legal matter without preparation adequate in the circumstances.... (3) Neglect a legal matter entrusted to him."
[11] DR 9-102 provides:

DR 9-102 Preserving Identity of Funds and Property of a Client.
(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:
(1) Funds reasonably sufficient to pay bank charges may be deposited therein.
(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.
(B) A lawyer shall:
(1) Promptly notify a client of the receipt of his funds, securities, or other properties.
. . . . .
(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.
(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.
[12] Rule 1.1(a) provides: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."
[13] Rule 1.3 provides: "A lawyer shall act with reasonable diligence and promptness in representing a client."
[14] Rule 1.4(a) provides: "A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information."
[15] Rule 1.16(a) provides: "[A] lawyer ... shall withdraw from the representation of a client if:....(3) the lawyer is discharged." Rule 1.16(d) states: "Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as... surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned."
[16] Bessie Jones came to Lindsay after another attorney had reached a dead end with the Scotlandville property. After Lindsay, the attorney she consulted declined to get involved at all.