329 So.2d 437 (1976)
LOUISIANA STATE BAR ASSOCIATION, Petitioner,
v.
R. C. EDWINS, Respondent.
No. 55456.
Supreme Court of Louisiana.
February 23, 1976.
*440 A. Russell Roberts, Chairman, Wood Brown, III, New Orleans, Sam J. D'Amico, Baton Rouge, Leonard Fuhrer, Alexandria, Harold J. Lamy, New Orleans, Edgar H. Lancaster, Jr., Henry A. Politz, Shreveport, John F. Pugh, Thibodaux, John B. Scofield, Lake Charles, Thomas O. Collins, Jr., New Orleans, Counsel, Louisiana State Bar Association Committee on Professional Responsibility, for petitioner.
Walker P. Macmurdo, Macrino R. Trelles, Jr., Baton Rouge, for respondent.
TATE, Justice.
The Louisiana State Bar Association, appearing through its Committee on Professional Responsibility, instituted these disciplinary proceedings against R. C. Edwins, a member of the Louisiana bar. La.Const. of 1974, Art. 5, Section 5(B). Under the provisions of Article XV, Section 6, of the Articles of Incorporation of the Association (1971), approved by us as a rule of this court, a commissioner was appointed to take evidence and to report to us his findings of fact and conclusions of law.
The commissioner's report filed with this court, after making certain findings of fact, concluded: "It is, therefore, the conclusion of the undersigned that Respondent, R. C. Edwins, has been guilty of professional acts and omissions which do not conform to standards of character and conduct laid down by the profession, particularly with reference to advancement of money and failing to account to the client for funds received. It is the further conclusion of the undersigned that Respondent, R. C. Edwins, did seek representation of Ralph H. Thomas and this constitutes solicitation. Being unable, however, to determine which Disciplinary Rule, if any, was or would be violated, the undersigned cannot conclude that a violation, as a matter of law, did occur."
To this report, the Association through its Committee on Professional Responsibility filed a concurrence to its findings of fact, but excepted to its conclusion of law that the solicitation activity shown by the respondent Edwins did not constitute a violation of a disciplinary rule. The respondent did not formally except to the commissioner's report; however, by brief and oral argument through his counsel before this court, be vigorously contests both the findings of fact and the conclusions of law.

I. Scope of Review

At the outset, we are faced with the Association's contention that the respondent's failure to except formally to the commissioner's report timely bars this court from considering the findings of fact and conclusions of law therein which are adverse to the petitioner. In so concluding, the Association relies upon Article XV, Section 6(d) of its Articles of Incorporation, which provides:
"(d) Report of the Commissioner Upon the termination of the hearing, the commissioner shall file with the Supreme Court his written report wherein he will state his findings of fact and conclusions of law. The parties shall have twenty (20) days from the time of the filing of the report to file exceptions thereto, and if no exceptions are, within that period, filed by either party, the report shall be confirmed. If exceptions are filed, they shall be heard by the court on the summary docket on the record prepared by and before the commissioner."
Before discussing this contention, it may be well to review the respective functions and authority of the Association and of this court in disciplinary matters.
This court has "exclusive original jurisdiction of disciplinary proceedings against a member of the bar". La.Const. of 1974, Art. 5, Section 5(B). See also La.Const. of 1921, Art. 7, Section 10(2). The state bar association is created and regulated under the rule-making power of *441 this court, and its articles of incorporation, disciplinary proceedings, and code of professional conduct have been adopted as rules of this court. This adoption by rule is pursuant to the cited constitutional mandate and in accord with the inherent power of this court to prescribe rules and regulations governing the practice of law in the jurisdiction.
See: Rules of Supreme Court of Louisiana, Rule 19 (1973); La.R.S. 37:211; In re Mundy, 202 La. 41, 11 So.2d 398 (1942); Hood, Renewed Emphasis on Professional Responsibility, 35 La.L.Rev. 719, 722-23, 737-39 (1975).
We have held that, when a respondent attorney fails to except (as required by the court rule) to the factual findings of the commissioner's report, they are confirmed against him. Louisiana State Bar Association v. Klein, 253 La. 603, 218 So.2d 610 (1969); Louisiana State Bar Association v. Mayeux, 249 La. 7, 184 So.2d 537 (1966); Louisiana State Bar Association v. Powell, 248 La. 237, 178 So.2d 235 (1965); Louisiana State Bar Association v. Youder, 243 La. 909, 148 So.2d 597 (1963); Louisiana State Bar Association v. Wheeler, 243 La. 618, 145 So.2d 774 (1962), and Louisiana State Bar Association v. Woods, 243 La. 94, 141 So.2d 828 (1962).
However, as these decisions recognize, the ultimate responsibility as to the discipline warranted by the facts rests with this court. Further, while some of the decisions contain statements that the commissioner's conclusions of law, if not excepted to, become conclusive, such statements are dicta in the light of the issues then before the court.
As we noted in In re Reed, 207 La. 1011, 22 So.2d 552, 555-56 (1945): "The Commissioner's report is prepared and furnished solely for the court's assistance and convenience in determining the issues of the disbarment proceeding, and any recommendations contained therein are not conclusive on the court."
Again, with regard to the specific issue before us, we stated in Louisiana State Bar Association v. Wheeler, cited above, 145 So.2d at 777-78:
"And whether respondent's exception to the report . . . was timely is immaterial under the circumstances, for this court in discharging its responsibility in disbarment proceedings must, of necessity, review the record in order to mete out the proper disciplinary action in the light of the charges, defenses, evidence and report of the commissioner. That portion . . . of the Articles of Incorporation of the Louisiana State Bar Association providing the report `shall stand confirmed' where no exceptions are timely filed, means only that it stands confirmed as to the party or parties failing to except `within' the twenty-day period from its filing. Our right to review the record in such an important matter has nevereither by our rules or in our pronouncements in individual casesbeen relinquished or surrendered to the commissioner; and the parties, by failing to timely object to his report, cannot thus curtail the duties and responsibilities of this court."
Thus, while the respondent's failure to formally except to the commissioner's report may bar his right to contest that certain facts occurred (if this court, in its independent review, finds that sufficient and competent evidence supports them), nevertheless it is the responsibility of this court, not of the commissioner, to conclude whether, as a matter of law, such facts constitute the unethical conduct charged, as well as for it to assess what penalty it deems appropriate if it finds disciplinary proceedings are warranted.
Preliminarily, we should note that, in disbarment proceedings the burden rests on the association to establish proof of misconduct by clear and convincing evidence. Louisiana State Bar Association *442 v. Brown, 291 So.2d 385 (La.1974). See also Louisiana State Bar Association v. Levy, 292 So.2d 492 (La.1974), and In re Novo, 200 La. 833, 9 So.2d 201 (1942).
"Clear and convincing evidence", in general, means that the fact of guilt must be proven to a greater degree than by "a mere preponderance of the evidence" but less than by "beyond a reasonable doubt". Sanders v. Sanders, 222 La. 233, 62 So.2d 284 (1952); Annotation, Attorneys' MisconductDegree of Proof, 105 A.L.R. 984 (1936). See also 7 C.J.S. Attorney and Client § 33(3), and 7 Am.Jur.2d, "Attorneys at Law", Section 67. As stated at Sanders, The Anatomy of Proof in Civil Actions, 28 La.L.Rev. 297, 304 (1968): "The standard requires that the existence of the disputed fact be highly probable, that is, much more probable than its non-existence." (Italics ours.) See also: McCormick on Evidence, Section 340(b) (2d ed. 1972).

II. Disciplinary Rules Allegedly Violated

The Code of Professional Responsibility for Louisiana Lawyers (adopted as a rule of this court), Article 16, Articles of Incorporation, Louisiana State Bar Association, is divided into "(1) Canons, (2) Ethical Considerations, and (3) Disciplinary Rules. The Canons are `statements of axiomatic norms, expressing in general terms the standards of professional conduct expected of lawyers in their relationship with the public, with the legal system and with the legal profession.' The number of canons has been reduced from forty-seven to nine. Ethical Considerations are `aspirational in character,' and they represent `the objectives toward which every member of the profession should strive.' The Disciplinary Rules are mandatory in character. They `state the minimal level of conduct below which no lawyer can fall without being subject to disciplinary action.'" Hood, Renewed Emphasis on Professional Responsibility, 35 La.L.Rev. 719, 737 (1975).
The disciplinary rules which the Association contends were violated by the respondent Edwins are:
Disciplinary Rule 2-103 provides: "A lawyer shall not recommend employment, as a private practitioner, of himself, his partner, or associate to a non-lawyer who has not sought his advice regarding employment of a lawyer";
Disciplinary Rule 9-102(B)(3) provides that a lawyer shall "maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them"; and,
Disciplinary Rule 5-103(B) provides: "While representing a client in connection with contemplated or pending litigation, a lawyer shall not advance or guarantee financial assistance to his client, except that the lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and presenting evidence, provided the client remains ultimately liable for such expenses."

III. Specifications of Misconduct

The hearing before the commissioner involved two general specifications:
1. That in July, 1970 the respondent Edwins (a) improperly solicited employment as attorney from Ralph Thomas to represent him in a seamen's suit, (b) improperly advanced financial assistance to Thomas during his representation of him, and (c) when the suit was settled in May 1972, improperly neglected to account to Thomas for the withholding of advances and expenses (in addition to his fee) from the proceeds of the settlement.
2. That, during his representation of Donald Selzer in a seamen's suit from MarchJune 1972, Edwins improperly advanced some funds to his client.
*443 We will discuss these specifications in the order thus set forth.
Specification 1(a): Solicitation
The commissioner's report finds: "The evidence in this case is clear and convincing to the effect that Respondent [Edwins], with the aid of an employee (Johnson) and the assistance of a stranger (Enos Danos) did call upon Ralph H. Thomas at his trailer home in Raceland, Louisiana. As a result of this visit, respondent obtained a contract of employment to represent Thomas in the capacity of an attorney at law. Thomas did not seek out respondent for advice nor did he make any effort to contact respondent. It was a suggestion from Danos to Johnson that led Johnson to Thomas and ultimately resulted in the visit by respondent to Thomas."
The virtually uncontradicted evidence supports this factual conclusion by the commissioner. Nevertheless the commissioner could not find that the conduct in question violated any disciplinary rule. The Association excepts to this conclusion.
Disciplinary Rule 2-103(A), above quoted, prohibits an attorney from recommending his own employment "to a non-lawyer who has not sought his advice regarding employment of a lawyer." A lawyer cannot circumvent this disciplinary rule through the action of another, Disciplinary Rule 1-102(A)(2), such as by his employee (Johnson) or by a non-lawyer third person (Danos) who (without authorization from a claimant) informs the attorney of some claimant's need for legal representation, even though that third person requests the lawyer to go by and visit the claimant.
The issue, thus, is whether Edwins through his employee Johnson solicited employment to represent Thomas, either from Thomas himself or from Danos, a third party who was not authorized by Thomas to request an attorney to come see Thomas. If, on the other hand, Thomas did request Danos to secure an attorney for him, then no solicitation by Edwins occurred he came to see Thomas at the request of Thomas (through the latter's agent in the matter, Danos).
The attorney Edwins' chief defense is that he and his employee Johnson did not solicit employment; that they contacted Thomas only at the request of Danos, a stranger to them; and that they presumed that Danos was authorized by Thomas to attempt to locate an attorney for him, since Danos was a former employer, a quasi-landlord, and a responsible businessman who was Thomas's friend.
Neither Danos nor Johnson was subpoenaed to testify by either the Association or Edwins. Edwins contends that the failure of the Association to call these two as witnesses constitutes a failure on its part to produce the clear and convincing proof of solicitation required for disciplinary proceedings.
We were given some pause by this contention. After all, knowing of the relationship between Danos and Thomas, Edwins might not unreasonably have concluded that Danos was authorized by Thomas to assist him in securing an attorney to represent him.
On the other hand, the evidence of Thomas and his wife is to the effect that Danos knew of their need for an attorney, but that they did not request him to secure one. In the face of the evidence, in our opinion, the burden shifted to Edwins to secure the testimony of Danos to disprove their testimonyespecially since there is no testimony in the record that Edwins was in fact informed by anyone that Danos was authorized by Thomas to help him secure an attorney.
Likewise, we conclude that the burden was on Edwins to produce Johnson as a witness. An indicia of solicitation arises from the circumstance that an attorney's *444 paid employee calls upon a claimant who denies that he had authorized anyone to help him secure an attorney. The attorney cannot, after acting through such a non-lawyer employee (whom the evidence indicates solicited employment from a non-lawyer), then claim that his responsibility for the employee's act is not proved. He cannot contend the Association failed in its burden of proof because it did not call the attorney's former employee as a witness to present a possibly exculpatory explanation. (The evidence here shows that Edwins could have, but did not, subpoena the employee, Johnson. We are not faced with a situation where the testimony, exculpatory or inculpatory, of the witness was unavailable.)
We therefore conclude that solicitation was proved. We also conclude that, under all the circumstances shown by the evidence, Edwins should be suspended from the practice of law for ninety days from the date of finality of this decision. In the first disciplinary instance before us of improper (near) solicitation, we merely imposed a reprimand. Louisiana State Bar Association v. Rutledge, 270 So.2d 535 (La.1972). The conduct was not, however, held to constitute solicitation. (Should further violations occur subsequent to the finality of this decision, we shall consider imposing a sanction more severe than the present one, if the facts of the solicitation so warrant.)

Specification 1(b): Failure to Account to Client for Proceeds of Settlement
The evidence is convincing that, after a day of trial in federal court, Thomas agreed with Edwins that his claim should be settled for $9,000. The evidence had not proved as strong a case as hoped. At this time, Thomas knew without dispute that from these proceeds he would have to pay Edwins a fee of at least $3,000, and also that, deducting previous advances made to him, he would receive no more than $3,000 net. Tr. 39-40, hearing of July 17.
At the time, Thomas was not dissatisfied. However, when he and his wife appeared at Edwins' office a few days later to complete the settlement, the account of advances and expenses showed that he was entitled to receive a net rounded off at $2,500. He was not satisfied with this as the balance due him.
Edwins himself was not in the office at the time. Edwins' partner, however, offered to withhold the disbursement until Edwins returned. Nevertheless, Thomas accepted the check for $2,500 as representing the net due him. Thomas's wife claims that, at the time, she requested an itemized account; but the preponderance of the evidence is otherwise.
We may here say that the undisputed proof shows that no money due to Thomas was withheld from him by Edwins. Under cross-examination, he admitted receiving all sums shown on Edwins' books as advances made to him or for his account.
Nevertheless, Edwins' carelessness in accounting to his client for the proceeds of the settlement should be reprimanded. Thomas did not, in fact, receive an accounting until the disciplinary hearing below. If an itemized statement had been furnished the client at the time of the settlement, his client's dissatisfaction and his unfounded suspicion that he had not received all amounts due him might have been avoided. An attorney's conduct should avoid even the appearance of impropriety.

Specification 1(c): Advances to Thomas
Edwins frankly admitted that he had advanced to Thomas on various occasions sums of money ($20, $50, $30, $10, etc.), which totaled $894 in all. Additionally, he had bought tires ($30.41), paid three car notes ($67.50 each), paid two other finance notes ($31.04 each), and arranged for and paid for Thomas's hospitalization and operation ($579.25) in connection with a non-accident related painful condition. In *445 the latter instance, he had also paid Mrs. Thomas's hotel bill ($36.04), so that she could be near Thomas during his hospitalization.
Also, not long after Thomas had retained him, Edwins had arranged for Thomas to receive a $650 loan from a finance company (partially owned by Edwins). Since Thomas did not pay it when due, Edwins paid it in its then due amount of $910.
Thomas admitted that, upon his request and on his seriatim pleas that he was in need, he had been able to receive about $2,000 in cash advances from Edwins. Under cross-examination, he also conceded that, at his request, the other nonlegal expenses shown (tires, car notes, hospitalization, wife's hotel room, etc.) had also been paid by Edwins.
In summary, the final accounting of Edwins to Thomas showed that he had advanced $4,210 in all, of which $1,480.01 was for direct expenses of preparing for trial.[1]
However, a total of $2,733.12 (including $579.25 for hospitalization and surgery for a non-accident related illness) represents a type of advance which is arguably prohibited by the letter of Disciplinary Rule 5-103(B): "While representing a client in connection with contemplated or pending litigation, a lawyer shall not advance or guarantee financial assistance to his client, except that the lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and presenting evidence, provided the client remains ultimately liable for such expenses." (Italics ours.)
Nevertheless, under the circumstances here shown, we are unwilling to hold that the spirit or the intent of the disciplinary rule is violated by the advance or guarantee by a lawyer to a client (who has already retained him) of minimal living expenses, of minor sums necessary to prevent foreclosures, or of necessary medical treatment.
In the first place, the disciplinary rule was adopted to implement Canon 5: "A lawyer should exercise independent professional judgment on behalf of a client." In interpreting the disciplinary rule, we should do so in the light of the canon and the ethical considerations on which it is based. At least two of the ethical considerations point out policies which permit lawyer-client fee arrangements or advances when they represent the only practicable method by which a client can enforce his cause of action.[2]
*446 If an impoverished person is unable to secure subsistence from some source during disability, he may be deprived of the only effective means by which he can wait out the necessary delays that result from litigation to enforce his cause of action. He may, for reasons of economic necessity and physical need, be forced to settle his claim for an inadequate amount.
We do not believe any bar disciplinary rule can or should contemplate depriving poor people from access to the court so as effectively to assert their claim. Cf, Canon 2: "A lawyer should assist the legal profession in fulfilling its duty to make legal counsel available." Nor do we see how a lawyer's guarantee of necessary medical treatment for his client, even for a non-litigation related illness, can be regarded as unethical, if the lawyer for reasons of humanity can afford to do so.
The advances and guarantees here made are, in our opinion, more akin to the authorized advance of "expenses of litigation" than to the prohibited advances made with improper motive to buy representation of the client or by way of advertising to attract other clients. We note that the disciplinary rule permitting the advance of "expenses of litigation" includes certain instances as illustrative, but that it does not clearly exclude other expenses similarly necessary to permit the client his day in court, such as arguably are the present.
Additionally, however, if the intent of the disciplinary rule were indeed to prohibit the type of advances and guarantees here made, we have some doubt as to its constitutionality. In Brotherhood of Railroad Trainmen v. Virginia, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964), the United States Supreme Court struck down a state regulation of the practice of law, holding that such regulation could not unreasonably handicap a claimant's right to petition the courts nor unreasonably inhibit the enforcement of a federal statutory right. For similar reasons, a court-adopted bar disciplinary rule which places an unreasonable burden upon an individual's right to enforce claims allowed him by law might be deemed violative of the access to courts guaranteed to all our people by our state constitution.[3]
In our opinion, the better view of those decisions which applied the former canons of ethics (replaced by the present Code of Professional Responsibility) was that the advancement of living expenses did not constitute a violation of professional responsibility, so long as: (a) the advances were not promised as an inducement to obtain professional employment, nor made until after the employment relationship was commenced; (b) the advances were reasonably necessary under the facts; (c) the client remained liable for repayment of all funds, whatever the outcome of the litigation; and (d) the attorney did not encourage public knowledge of this practice as an inducement to secure representation of others. See: Annotation, Attorneys Clients' Expenses, 8 A.L.R.3d 1155 (1966); Strelow, Loans to Clients for Living Expenses, 55 Calif.L.Rev. 1419 (1967).
*447 A similar interpretation of the present Code of Professional Responsibility may be more difficult in view of the different wording of the present-day disciplinary rule at issue. Nevertheless, for the reasons earlier stated, we believe that it is justified. At least under the circumstances here shown, the spirit and intent of the canon and the ethical considerations involved is similarly not a violation of professional conduct subject to disciplinary penalty. It is more akin to the permitted advances of expenses of litigation than to the prohibited advances to purchase an interest in a law suit or to induce a client to retain the lawyer.
In the present case, the evidence shows that, between June 1970, (when Edwins was retained by Thomas) and June 1972, (when the case was settled), some twenty-four months later, Edwins advanced to Thomas $2,152.87 of living expenses (including car notes, etc.), plus $579.25 for needed medical attention. During this same period of time, Thomas drew $3,472 in maintenance and cure, which was also available for the client's living expenses.
At the time Thomas retained Edwins, he was not receiving maintenance and cure. Without charge to Thomas, Edwins secured the payment of maintenance and cure in the amount of $56 weekly. Also, likewise without charge to Thomas, Edwins handled various debt negotiations and other legal advisory and representational services not related to the accident case for which he had been retained.
During that same two-year period, a two-person non-farm family with income below $5,422 (a little below $2,716 per year average) fell below the poverty level.[4] The maintenance and cure of $3,472 received by Thomas during this period was insufficient even for the minimum subsistence level of the poorest people in our economy; and Thomas, a high-paid seaman (i. e., an amphibious oil worker) was used to a higher standard of living. (He had, for instance, car notes of $67.50 monthly to meet.) We cannot say that Edwins' advances of $2,152.67 living expenses during this period, or of $579.25 necessary medical treatment, was unreasonable or of a prohibited nature under the standards above set forth.
We should also note that Thomas testified that, at the time he retained Edwins, he told him he needed some money, and that Edwins said he would try to help him. (A few days later, when Thomas came to Edwins' office in Baton Rouge, Edwins arranged for a finance company to loan Thomas some money to take care of pressing needs.) Edwins, however, denies that any such inducement was made to obtain his retainer by Thomas. This denial seems to be corroborated by Mrs. Thomas's failure to recollect any such discussion. See Tr. 74-76, hearing of July 17.
We therefore find Edwins guilty of no professional misconduct requiring disciplinary action with regard to the minimal advances made by him to Thomas.

Specification 2: Advances to Selzer
However, with regard to the remaining specification, which charges improper advances to Selzer, we do find improper conduct.
*448 Selzer, a seaman, was injured in February 1972. Being dissatisfied with an attorney he had earlier retained, he sent for Edwins in late February to visit him while still in the hospital. He there retained Edwins as his attorney.
Edwins represented Selzer for approximately three months. During that time, Edwins filed a suit for him, made at least two motion appearances, and spent about fifty hours in his service. Edwins finally relinquished Selzer as a client, because of Selzer's repeated demands for money advances. Between February 27 and April 17, however, Edwins had advanced Selzer $756.95 in monied loans (in addition to $303.32 paid out for normal expenses of litigation).
These cash advances violate the prohibition of Disciplinary Rule 5-103(B). Unlike the advances made to Thomas (Specification 1(c) above) for necessary living and medical expenses, no justification is shown for them. In the absence of such justification, we apply the literal wording of the rule and presume that the advances were improperly made with the intention of securing or keeping legal representation of Selzer.
We therefore must hold that the cash advances by Edwins violated the disciplinary rule forbidding them. For this violation, we will order his suspension from the practice of law for a period of thirty days, this suspension to run concurrently with his suspension for soliciting his own employment by Thomas.
Nevertheless, in fairness to the respondent Edwins, the implication from Selzer's testimony is that periodic advances not necessarily based on need are a common practice in maritime litigation. High-paid seamen, unable on maintenance and cure during disability to maintain their style of life, apparently demand and receive rather large advances pending final disposition of such high-award litigation.
Selzer's testimony is open to the construction that, in the absence of such advances, he would not retain a lawyer. He testified, for instance, that the lawyer he retained to replace Edwins had advanced him $4,000 during the year prior to settlement. (We do not mean to imply that, under the guidelines above set forth, this latter necessarily was an advance prohibited by the rule, as not being a reasonable "expense of litigation".)
In a sense, the client's dissatisfaction with Edwins and the consequent disciplinary proceedings resulted from Edwins' refusal to make any more advances and the resultant termination of Edwins' representation of him. It might be said that the present complaint results, not from Edwins' violation of the disciplinary rule, but because he refused to continue to violate it.
The troublesome query presented by Selzer's testimony is whether the rule prohibiting advances, even under the less restrictive interpretation we place upon it, is practicably enforceable (except selectively, as here). The long-customary practices of maritime law lead to expectations of such services to the clients whom the bar serves in this area of litigation. Selzer's testimony implies that, if Louisiana lawyers do not meet the need and expectation established by this ancient custom, lawyers from other areas will.
But neither the moral desireability nor the practical difficulties of the rule are before us now. Nor is any issue of either modification or else less-selective enforcement of the rule as now adopted, which the respondent's conduct violated. For this deliberate and unexcused violation, we deem disciplinary action required, as set forth above.

Decree
For the reasons above set forth, we find that the respondent R. C. Edwins violated applicable disciplinary rules (a) by soliciting his own employment in the Thomas *449 case, (b) by negligently failing to account to his client in that case for the disbursement of the proceeds of the settlement, and (c) by improperly advancing funds to his client in the Selzer case for the purpose of inducing the client's employment of him as the attorney in the case. For violation (a), we suspend the respondent from the practice of the law for a period of ninety days from the date of finality of this decision; for violation (b), we reprimand him for unprofessional conduct which tends to bring disrepute upon the legal profession; and for violation (c), we suspend him from the practice of the law for a period of thirty days from the date of finality of this decision, said suspension to run concurrently with the suspension for violation (a). The respondent is cast with all costs of these disciplinary proceedings.
SUSPENSION AND REPRIMAND ORDERED.
SUMMERS, J., concurs in the result.
DIXON, J., dissents with reasons.
DENNIS, J., dissents for the reasons assigned by DIXON, J.
DIXON, Justice (dissenting).
I respectfully dissent.
It seems to me that there is no question about the violation of the disciplinary rules violations which we should not condone. The disciplinary rules should be enforced in such a way as to give them meaning and significance in regulating the conduct of members of the bar.
NOTES
[1] In addition to court costs, investigation costs, the expenses of medical examination for purposes of trial, and the costs of obtaining and presenting evidence, certain other out-of-pocket expenses were charged to Thomas: telephone calls, out-of-town travel at twelve cents per mile, and the hotel expenses of the out-of-town trial. The contract between Thomas and Edwins was silent with regard to liability for the latter (about $500) expenses. In the absence of other contractual arrangement, we do not find irregularity in charging such expenses to the client's account, to be reimbursed upon final settlement (and they are shown by the present record to be reasonable); but the better practice might well be to have liability for such lattertype out-of-pocket expenses to be clearly assumed or not by the client at the time of the retainer, so as to prevent misunderstanding and dissatisfaction such as here resulted.
[2] Ethical Consideration 5-7 provides: "The possibility of an adverse effect upon the exercise of free judgment by a lawyer on behalf of his client during litigation generally makes it undesirable for the lawyer to acquire a proprietary interest in the cause of his client or otherwise to become financially interested in the outcome of the litigation. However, it is not improper for a lawyer to protect his right to collect a fee for his services by the assertion of legally permissible liens, even though by doing so he may acquire an interest in the outcome of litigation. Although a contingent fee arrangement gives a lawyer a financial interest in the outcome of litigation, a reasonable contingent fee is permissible in civil cases because it may be the only means by which a layman can obtain the services of a lawyer of his choice. But a lawyer, because he is in a better position to evaluate a cause of action, should enter into a contingent fee arrangement only in those instances where the arrangement will be beneficial to the client." (Italics ours.)

Ethical Consideration 5-8 provides: "A financial interest in the outcome of litigation also results if monetary advances are made by the lawyer to his client. Although this assistance generally is not encouraged, there are instances when it is not improper to make loans to a client. For example, the advancing or guaranteeing of payment of the costs and expenses of litigation by a lawyer may be the only way a client can enforce his cause of action, but the ultimate liability for such costs and expenses must be that of the client." (Italics ours.)
[3] See La.Const. of 1974, Art. 1, Section 22: "Access to Courts. All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights." See also La.Const. of 1921, Art. 1, Section 6.
[4] The poverty levels for 1970-1972 are as follows:

YEAR TWO-PERSON FAMILY ONE-PERSON
____ _________________ __________
 Non-Farm Farm Non-Farm Farm
 ________ ____ ________ ____
1970 $2,604 $2,218 $2,010 $1,727
1971 $2,716 $2,317 $2,098 $1,805
1972 $2,808 $2,393 $2,168 $1,861

Bureau of the Census Current Population Reports: Consumer Income, Characteristics of the Low Income Population, Table N, p. 20 (1970); Table M, p. 18 (1971); and Table A-2, p. 143 (1972).