788 So.2d 1140 (2001)
George CHITTENDEN and Roberta Kay Chittenden
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, et al.
No. 2000-C-0414.
Supreme Court of Louisiana.
May 15, 2001.
Dissenting Opinion from the Denial of Rehearing June 22, 2001.
*1142 Jacques F. Bezou, Robert H. Matthews, Bezou & Matthews, Covington, Pauline M. Warriner, Counsel for Applicant.
Jack M. Alltmont, New Orleans, Darryl J. Carimi, Metairie, Counsel for Respondent.
Harvey J. Lewis, New Orleans, John W. deGravelles, Baton Rouge, Counsel for Louisiana Trial Lawyers Assn. (Amicus Curiae).
Dissenting Opinion from the Denial of Rehearing of Judge Lemmon, June 22, 2001.
KNOLL, Justice.
We granted the writ application of George Chittenden and his wife, Roberta Kay Chittenden, to address the issue of whether Darryl J. Carimi ("Carimi"), the Chittendens' discharged attorney, can recover interest on funds he advanced to the Chittendens during the period of his representation. George Chittenden and Roberta Kay Chittenden v. State Farm Mut. *1143 Auto. Ins. Co., 00-0414 (La.6/16/00), 763 So.2d 610.

FACTS AND PROCEDURAL HISTORY
On June 19, 1992, George Chittenden ("Chittenden") retained Carimi[1] to handle a personal injury claim which arose from an automobile accident. The written retainer agreement Chittenden signed was fairly standard;[2] however, Chittenden also authorized Carimi to secure a loan at his discretion to "[pay] the costs and expenses necessary to prosecute" his tort claim; Roberta Kay Chittenden did not sign the written agreement. In connection with "costs," Chittenden agreed to reimburse Carimi for copy costs, mock jury and shadow jury costs, medical expenses, travel expenses, costs of medical records, depositions, expert fees, long distance telephone costs, court costs, advances to him or guarantees made on his behalf, and all expenses of litigation.[3] Chittenden further agreed "that the full amount of the interest charged on such loans will be reimbursed to Attorneys ... out of the funds received on this claim." A specific interest rate was not written in the contract.
From the inception of the attorney-client relationship between Chittenden and Carimi until the dissolution of that relationship on January 3, 1994, Carimi advanced sums on Chittenden's behalf for medical expenses, court costs, postage, photocopying, and the like. Carimi also advanced living expenses to Chittenden. At the end of each month, Carimi would draw from his line of credit at the bank[4] to meet the funds advanced and assessed an interest charge to Chittenden's account. According to Carimi, the law firm's accounting program charges interest monthly on each client's file based upon the client's daily *1144 balance during the month, i.e., from the date each payment was posted to the file. In the following month, interest was calculated on the new principal balance.
After Chittenden discharged Carimi and hired new counsel, Carimi intervened in the proceedings to protect his right to the legal fees he was owed,[5] together with a claim for reimbursement for funds advanced and interest expended on loans Carimi made pursuant to his contract with Chittenden. In response to the intervention, Chittenden agreed to pay Carimi $46,162.54 in reimbursement for costs and funds advanced,[6] but he refused to pay the $40,859.25 which represented interest charges.[7]
After conducting an evidentiary hearing, the trial court awarded Carimi interest in the sum of $40,859.25 and allowed him to remove this amount from funds which had been placed in the court registry. Carimi withdrew these funds and paid Chittenden's interest charges attributable to him on Carimi's line of credit.
Chittenden perfected a devolutive appeal from the trial court's ruling on Carimi's motion for reimbursement. The appellate court upheld the trial court and determined that Carimi was within the ethical constraints of the Rules of Professional Conduct ("RPC"). Chittenden v. State Farm Mut. Auto. Ins. Co., 98-2919 (La. App. 4 Cir. 12/15/99), 748 So.2d 641, 647. The court of appeal reasoned that under Edwins, 329 So.2d at 437, the action of advancing funds to a client was not illegal and was permitted by this Court. With regard to the interest charges on the advances made, the appellate court determined that because it was permissible to lend money to clients for litigation expenses and for minimal, necessary living expenses, it was not a violation of the RPC to pass "along that portion of the interest attributable to the plaintiffs on the line of credit with the banks." Chittenden, 748 So.2d at 647. The court of appeal stated:
We have reviewed the record and are in agreement with the trial court that neither Darryl J. Carimi nor his law firm has violated any rules of professional conduct in making advances to the plaintiffs and in passing along that portion of the interest attributable to the plaintiffs on the line of credit with the banks. This is in accord with the economic, legal and social realities that are part of the legal profession as we know it today. Additionally, after reviewing the record we do not agree with the appellants that Darryl J. Carimi charged usurious interest and neither can we find a hidden, improper motive on the part of Darryl J. Carimi or his law firm in advancing the sums of money claimed.
Chittenden, 748 So.2d at 647.
Because of the importance of Edwins, 329 So.2d at 437 to the analysis in the lower courts, we will briefly summarize our holding in that case and look at the RPC since we penned that decision.

EDWINS POLICY
In Edwins, a disciplinary proceeding against an attorney, we addressed, interalia, *1145 the propriety of an attorney advancing funds to his client in violation of Disciplinary Rule 5-103(B).[8] With Justice Tate writing for the majority in Edwins, we concluded that while a part of the advanced expenses were seemingly prohibited by the disciplinary rules, we were "unwilling to hold that the spirit or the intent of the disciplinary rule is violated by the advance or guarantee by a lawyer to a client (who has already retained him) of minimal living expenses, of minor sums necessary to prevent foreclosures, or of necessary medical treatment." Edwins, 329 So.2d at 445. Thus, this Court set the policy that attorneys were permitted to advance funds to their clients for minimal, necessary living expenses and that clients would be responsible for reimbursing these funds. The theory behind the policy was that this Court did not want to force impoverished individuals into early settlements because they were unable to wait out the delays of litigation that are necessary to enforce a cause of action. Id. at 446.[9]
Clearly, Edwins set the policy in the State for attorney/client relationships where money was advanced by the attorney prior to the resolution of the litigation, which generally has been followed by the legal practitioners. The opinion set the limits on this privilege, including the following guidelines: (1) the advances cannot be promised as an inducement to obtain professional employment, nor made until after the relationship has commenced; (2) the advances were reasonably necessary under the facts; (3) the client remained liable for repayment of all funds, whatever the outcome of the litigation; and (4) the attorney did not encourage public knowledge of this practice as an inducement to secure the representation of others. Id. Nevertheless, the issue of charging interest on advanced sums was not covered in Edwins.

RPC POST-EDWINS

After Edwins, Disciplinary Rule 5-103(B) was replaced with RPC Rule 1.8(e) which states:
A lawyer shall not provide financial assistance to a client in connection with pending or contemplated litigation, except that:
(1) A lawyer may advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter, and
(2) A lawyer representing an indigent client may pay court costs and expenses of litigation on behalf of the client.
It is evident that although Rule 1.8(e) was promulgated after our decision in Edwins, *1146 it did not incorporate the gloss which that decision placed on former Disciplinary Rule 5-103(B).[10] Rather, Rule 1.8(e) unambiguously prohibited the advancement of funds and financial assistance in connection with litigation except in the limited cases of court costs and actual litigation expenses. Notwithstanding the wording of Rule 1.8(e), the current practice of law in our State follows the Edwins policy of allowing an attorney to advance funds under the constraints enunciated in Edwins.[11]

DISCUSSION
The Chittendens claim that they do not owe Carimi and his law firm interest for three reasons.[12] First, they contend that interest charges on advanced funds are in violation of Rule 1.8(e)[13] and potentially in violation of Rule 1.4[14] of the RPC. Secondly, because the agreement between Chittenden and Carimi fails to specify an exact interest rate, the charge of interest is unenforceable. Further, interest charges as to Mrs. Chittenden are unenforceable because she did not sign the agreement.
Carimi contends that the legal and ethical considerations of attorneys arranging interest-bearing financing for clients needs to be addressed in future regulation of the profession. However, he argues that because he and his law firm dealt fairly and reasonably with the Chittendens in obtaining financing for them at reasonable interest rates, the lower courts should be affirmed. Carimi further contends that neither he nor his law firm made money on the interest charges; rather, he stresses that interest was handled "merely [as] a pass-through transaction." Carimi points out that Mr. Chittenden admits that he knew he was being charged interest at the rate of 12% and further, that the Chittendens had paid 20% interest on a loan arranged by a *1147 previous attorney and 24%-38% on loans from a finance company without complaint.
The evidence shows that Darryl Breaux represented the Chittendens just prior to Carimi. In fact, when Breaux joined the Carimi Law Firm in 1992, he brought many clients, including the Chittendens, with him. He testified that although Chittenden signed a new contract with Carimi, Breaux maintained his status as lead attorney on the case and it was in that capacity that he explained to Chittenden that Carimi would advance court costs as well as living and medical expenses to him. Breaux told Chittenden that the contingency rate would remain the same, and further explained that interest would be charged on money Carimi advanced on Chittenden's behalf. According to Breaux, he told Chittenden that the rate of interest would be the "going rate at a bank," approximately 12%.
At the hearing on the motion for reimbursement, Carimi and Joseph Martin, III, a banking expert, disclosed Carimi's method of interest calculation. At the end of each month, Carimi would borrow money from the bank to pay off the interest accrued from the last month. For example, if an amount was expended on an account, and a certain sum of interest was owed, Carimi would borrow money to pay off the interest. As explained by Martin, Carimi's system of payment created a situation where interest was compounded and the clients were then paying interest on interest previously accrued.[15] In stark contrast, Carimi testified that the bank charged him 12% simple interest, billed monthly.
Carimi further testified that the money was not taken from the bank at the same time an expenditure was made on the Chittenden file. Instead, the money was taken from the line of credit in large sums, and then as each file had an expense, that expense would be paid, and then the client account would be charged. In order to calculate the daily interest owed, Carimi would take 1/365 of the annual rate and multiply that figure by the number of days in the month and the amount borrowed.

The Ethics of Charging Client Interest
The first issue we must face is whether an attorney may ethically charge his client interest for funds advanced during the litigation process. In order to address this question, we must place the attorney-client contract into the perspective of the Louisiana Civil Code and the RPC, and further review what "interest" is.
A contingent fee agreement entered into between an attorney and client is governed by the laws of obligations. See LA. CIV.CODE ANN. arts. 1756, 2990; Rush, Rush & Calogero v. Barrios, 97-1532 (La.App. 3 Cir. 4/22/98), 716 So.2d 23, writ denied, 98-2114 (La.11/6/98), 728 So.2d 868. Furthermore, based upon an attorney's requisite membership in the Louisiana State Bar Association, Articles of Incorporation, Art. IV(1), and this Court's adoption of the RPC on February 6, 1990, it is clear that the RPC permeates all facets of the lawyer-client relationship. Similarly, although the basic relationship between client and lawyer may be contractual, that association is nonetheless subject to the inherent authority of this Court to positively affect that fiduciary relationship[16] through its power to regulate the *1148 practice of law. See O'Rourke v. Cairns, 95-3054 (La.11/25/96), 683 So.2d 697; Edwins, 540 So.2d at 299.
As we stated in Succession of Wallace, 574 So.2d 348 (La.1991):
This court has exclusive and plenary power to define and regulate all facets of the practice of law, including the admission of attorneys to the bar, the professional responsibility and conduct of lawyers, the discipline, suspension and disbarment of lawyers, and the client-attorney relationship. LSBA v. Edwins, 540 So.2d 294 (La.1989); Saucier v. Hayes Dairy Products, Inc., 373 So.2d 102, 109, 115 (La.197[8]); LSBA v. Connolly, 201 La. 342, 9 So.2d 582 (1942); Ex Parte Steckler, 179 La. 410, 154 So. 41 (1934); Meunier v. Bernich, 170 So. 567 (La.App.[Orleans ]1936). The sources of this power are this court's inherent judicial power emanating from the constitutional separation of powers, La. Const.1974, Art. II; Saucier v. Hayes Dairy Products, Inc., supra; Ex Parte Steckler, supra; Meunier v. Bernich, supra, the traditional inherent and essential function of attorneys as officers of the courts, Ex Parte Steckler, supra; Meunier v. Bernich, supra; and this court's exclusive original jurisdiction of attorney disciplinary proceedings. La. Const.1974, Art. V, § 5(B); Saucier v. Hayes Dairy Products, Inc., supra. The standards governing the conduct of attorneys by rules of this court unquestionably have the force and effect of substantive law. Succession of Cloud, 530 So.2d 1146 (La.1988); Succession of Boyenga, 437 So.2d 260 (La.1983); Leenerts Farm[s], Inc. v. Rogers, 421 So.2d 216 (La.1982); Singer, Hunter, Levine, Seeman & Stuart v. LSBA, 378 So.2d 423, 426 (La.1979); Saucier v. Hayes Dairy Products, Inc., supra; LSBA v. Connolly, supra; Ex Parte Steckler, supra.

Succession of Wallace, 574 So.2d at 350; see also In re: Bar Exam Class Action, 99-2880 (La.2/18/00), 752 So.2d 159, 160.
Therefore, any dispute relative to an attorney-client relationship is subject to the close scrutiny of this Court and is resolved under the codal provisions as illuminated by the RPC. See Leenerts Farms v. Rogers, 421 So.2d 216 (La.1982); see also Watson v. Cook, 427 So.2d 1312, 1316 (La.App. 2 Cir.1983).
In the present case, it is eminently clear that Chittenden authorized Carimi in the written retainer agreement to secure a loan at his discretion to "[pay] the costs and expenses necessary to prosecute" his tort claim. Thus, it is clear that the various loans that Carimi made at the bank were made with Chittenden's authorization. Moreover, in accordance with RPC Rule 1.4 (Communication), Chittenden was fully informed through the written retainer agreement that Carimi would utilize loans needed to prosecute Chittenden's tort claim, and thus Carimi kept Chittenden properly informed of this likelihood.[17]
*1149 Additionally, it is clearly provided in the contract between Chittenden and Carimi that Chittenden agreed "that the full amount of the interest charged on such loans will be reimbursed to Attorneys ... out of the funds received on this claim." Thus, once again, the contract between the parties articulated both the expectation that interest would be charged on the loans Carimi made and that Chittenden would ultimately be responsible for the payment of that interest.[18]
This Court adopted the RPC as regulatory laws in the interests of the public, the courts, and the legal profession. Succession of Wallace, 574 So.2d at 356. Nevertheless, "the disciplinary rules are rules of reason that should be interpreted and applied with reference to the purposes of maintaining appropriate profession standards and protecting the public from substandard attorney conduct. In performing its regulatory function by applying and interpreting the disciplinary rules, this court will look beyond superficialities for legal, economic and social realities." Id.
In light of our decision in Edwins and the policy reasons which Justice Tate enunciated therein and after considering the various RPC provisions, we do not find that Carimi was ethically prohibited from entering into an agreement which obligated Chittenden to reimburse him for interest charged on loans used to fund litigation expenses and Chittenden's living expenses under the constraints of Edwins.[19] First, there is nothing to show in this record, assuming for the moment that Chittenden was charged 12% interest on these loans, that this interest rate was unreasonable.[20] As Chittenden and Carimi testified, the Chittendens paid 20% interest on a loan that a previous attorney arranged for them and 24%-38% on another loan that the Chittendens secured at a finance company. Second, this record is devoid of any evidence that Carimi utilized this interest rate as an advertisement to secure his representation of the Chittendens. Third, we cannot ascertain any hidden, improper motive on the part of Carimi in charging interest on the loans which he himself has had to pay to the lending institution. Fourth, as enunciated above, Chittenden has not shown that the loans Carimi secured were for items not contemplated in our Edwins decision. See supra notes 3, 6, and 13. In summation, as noted in the appellate court decision this determination of ethical conduct "is in accord with the economic, legal and social realties that are part of the legal profession as we know it today." Chittenden, 748 So.2d at 647.[21]
*1150 Louisiana is not alone in addressing the economic, legal, and social realities that litigation thrusts upon the legal profession. We note that several states have issued ethics advisory opinions and have approved the charging of interest. Several principles may be drawn from these opinions which we cite with approval: (1) the client must agree in writing to such a charge; and, (2) the interest rate must be lawful and reasonable. See Florida Opinion 86-2 (4/15/86); Maryland Opinion 94-24 (6/16/94); Illinois Opinion 94-6 (7/94); Virginia Opinion 1595 (6/14/94).
Having determined this threshold issue, we now turn our attention to the contractual agreement and its specific provision regarding the rate of interest applicable to the sums for which Chittenden is obligated to reimburse. In this regard, we are called upon to examine the Chittenden-Carimi agreement in light of the articles of the Civil Code which relate to interest.

Rate of Interest applicable
Chittenden contends that the interest provision is unenforceable because the contract which Carimi prepared failed to specify an exact interest rate. In response, Carimi advocates that Chittenden was explained that the interest rate would be that which the bank charged and that it would be approximately 12%.
"Interest is a charge, or fee, commonly expressed as an annual percentage rate, paid by a person for the use he makes of, or a detention he exerts on, monies belonging to another, for a specified period of time." 6 SAUL LITVINOFF, LOUISIANA CIVIL LAW TREATISE: THE LAW OF OBLIGATIONS, PUTTING IN DEFAULT AND DAMAGES § 9.4 (1999) (citing Trans-Global Alloy v. First Nat. Bank, 583 So.2d 443, 457-58 (La.1991)). Interest is either legal or conventional. LA. CIV.CODE ANN. art. 2924 A. When charging interest, the Louisiana Civil Code mandates that the conventional rate of interest cannot exceed 12% per annum and that the interest rate be expressed in writing. LA. CIV.CODE ANN. art. 2924C(1).[22] The article provides, in pertinent part:
C. (1) The amount of the conventional interest cannot exceed twelve percent per annum. The same must be fixed in writing; testimonial proof of it is not admitted in any case.[23]
*1151 It is equally clear that when laws are made for the protection of the public interest, persons may not by their juridical acts derogate from them.[24]
In the present case, the contract only provided that "the full amount of the interest charged on such loans will be reimbursed to Attorneys ... out of the funds received on this claim." It is obvious from a reading of the contract that Chittenden did not agree to pay a sum of conventional interest which was fixed in writing. It is likewise clear that Carimi may not establish the conventional rate of interest through the testimony of Chittenden and Breaux that they may have had discussions about what the interest rate might be.
Notwithstanding, Carimi may nonetheless recover interest from the dates that he expended money on Chittenden's behalf because he contracted to pay interest to Carimi on the loans that were made on his behalf. However, because Chittenden did not agree that interest would be compounded, he is only obligated to pay simple interest to Carimi. See LA. CIV.CODE ANN. art.2001,[25] Comment c (stating that although this article applies to interest which equates to moratory damages, it is inapplicable to interest paid for the use of money, "as when the parties agree that the interest on a loan shall be compounded, ....") (emphasis added). The question then arises, if this is so, what simple interest rate is applicable? Although none is specified in the contingent fee contract, we find that the Louisiana Civil Code and our jurisprudence provide the answer.
LA. CIV.CODE ANN. art.2000 provides, in pertinent part:
When the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest as fixed by Article 2924.
Moreover, in conformity with LA. CIV.CODE ANN. arts.2000 and 2924, the jurisprudence recognizes that when the interest rate is not agreed upon in writing, only legal interest can be claimed. See, e.g., Concrete Pipe Products Co. v. Bell, 427 So.2d 551, 554 (La.App. 3 Cir.), writ denied, 433 So.2d 1052 (La.1983); Succession of Drake, 359 So.2d 249, 252 (La.App. 2 Cir.1978); Holzer Sheet Metal Works v. Reynolds & Marshall, 43 So.2d 169 (La. App.Orl.1949); John Crossley & Sons v. Commissioners of Louisiana Sav. Bank & Safe Deposit Co., 38 La.Ann 74 (1886); Buckley v. Seymour, 30 La. Ann. 1341 (1878); Bayly v. Stacey, 30 La. Ann. 1210 (1878); White v. Jones, 14 La. Ann. 681 (1859). Thus, even though no rate of conventional interest was specified in the written agreement, Chittenden nonetheless owes legal interest on the loans Carimi made on his behalf.
This is a good example of how the attorney-client relationship is indeed sui generis. As noted above, the RPC permeates the attorney-client relationship. Certainly, if the contingent fee contract had not clearly shown that Chittenden was aware that loans would be made and that he would have to reimburse Carimi for the interest paid on these loans, the outcome of this litigation would have certainly been *1152 drastically different. We are not presented with an instance where the client did not agree in a written contract with his attorney to pay interest on loans made on his behalf. To the contrary, it is clear that Chittenden agreed to pay interest and only the rate of conventional interest was not specified in writing. Under these facts, we find that Carimi may only collect the rate of legal interest from Chittenden.
To this end, we observe that the rate of legal interest fluctuates and indeed numerous rates of legal interest may be applicable to the loans Carimi made on Chittenden's behalf between 1992 and the date that the district court allowed Carimi to withdraw funds from the court registry. See LA.REV.STAT. ANN. § 13:4202. Accordingly, we find it appropriate to remand this matter to the trial court for the computation of the rate of legal interest owed and to determine Chittenden's interest obligation.[26]

Carimi's practice of assessing interest
Even though we have resolved the question of interest in this manner, we find it necessary to further comment on Carimi's interest practice. Although Carimi contends that he only "passed through" to Chittenden the interest that the bank charged, a close examination of the facts indicates otherwise.[27] Our review, as that noted by the bank expert, Joseph Martin, III, shows that although the bank charged simple interest on Carimi's line of credit, the method that Carimi used resulted in the compounding of interest. See supra at p. 8. In this respect, we find the trial court manifestly erred when it found that Carimi merely passed on to the client the interest the bank charged him. As such it appears that Carimi may have charged Chittenden more than the simple interest which he was required to pay. We further note that even though Carimi charged Chittenden's file with interest from the date that money was advanced, the testimony does not bear out that Carimi actually accessed his line of credit at the bank at that same time. As shown in the testimony of Carimi's former firm accountant, Carimi may not have had to draw from his line of credit for days or weeks later. Accordingly, it again appears that Carimi may have charged Chittenden for days of interest that he (Carimi) was not charged by the bank.
We note these two examples because we find that this conduct may have implicated RPC Rule 1.8. In particular, because Carimi may have benefitted financially from this conduct, he would undoubtedly have improperly obtained an additional proprietary interest in the litigation. Nevertheless, because we have found that Carimi may only receive legal interest, and we have remanded this matter, we utilize this scenario only to expound on this rule and to caution the bar on the need for scrupulous adherence to the RPC so as to avoid ethical problems which may appear almost unnoticed in their practice.

CONCLUSION
Under the custom within the legal profession which has developed as a result of the Edwins decision,[28] we find that as an *1153 ancillary to Edwins that it was not ethically prohibited for Carimi to ask Chittenden to obligate himself in writing to pay interest, which was reasonable, on loans which Carimi acquired to fund litigation expenses and Chittenden's living expenses as recognized in Edwins. However, we find that Carimi is limited to the recovery of simple legal interest on the funds advanced in the performance of his contingent fee contract.

DECREE
For the foregoing reasons, the judgments of the lower courts are affirmed in part and reversed in part. This case is remanded to the trial court for the computation of Chittenden's interest obligations in accordance with the views expressed in this opinion.
REMANDED.
VICTORY, J., concurring.
The majority today decides that because advancing funds to a client was approved by this court in LOUISIANA STATE BAR ASSN. V. EDWINS, 329 So.2d 437 (La.1976), a lawyer can also reasonably require the payment of interest on such advances at the legal rate where no agreement on a specific interest rate is made. In EDWINS, we held that payment of certain minimal living expenses for a client did not violate the intent or spirit of the ethical rules for professional conduct then in force, reasoning that such expenses were akin to "expenses of litigation" as they enable a plaintiff to withstand the delays of litigation. We opined that the same result should obtain under the subsequently enacted Code of Professional Responsibility.
Had I been on this court when EDWINS was decided, I would have joined in the dissent filed by Justice Dixon. However, since our court has long followed the EDWINS rule and the bar has ordered its conduct in accordance therewith, I concur rather than dissent in the result reached today. Nevertheless, in my view lawyers should be prohibited from advancing money to clients and from charging interest on such loans except where expressly permitted to do so by RPC Rule 1.8(e). Hopefully, the committee we will appointed to study these issues will agree. See footnote 10 of the majority opinion.
Rehearing denied.
LEMMON, J., Dissenting from the Denial of the Application for Rehearing.
Critical to the resolution of this case is the trial judge's factual finding, not shown to be manifestly erroneous, that "[t]he Carimi Law Firm ... merely passes on to the client the amounts it has paid in interest to the lending institution at a much lower rate of interest than the client was have been able to obtain on his own." The firm paid over $40,000 in interest to the bank for the loan of funds received by the client. The firm secured a lower interest rate by furnishing certificates of deposit as security for the loans made solely for the benefit of the client.
The client agreed in writing to reimburse the firm for all interest paid by the firm on the authorized loans, and the client does not dispute that the firm paid interest to the bank at the rate of twelve percent. Yet this court denies the firm's right to reimbursement of the undisputed amount of interest because the precise rate of interest was not specified in the contingency fee contract.
This case must be viewed in light of the realities of everyday business transactions and the purpose of La. Civ.Code art. 2924C. The client authorized the firm to make loans to fund his necessary litigation expenses and request for advances, and agreed to reimburse the firm all interest paid on the loans. The firm made the authorized loans, and the rate of interest was ascertainable from the loan documents *1154 which were available for the client's inspection (and which usually would have been expected to be changing from time to time).
The purpose of Article 2924C was to prevent swearing contests when a lender and a borrower do not agree in writing on the rate of interest for a loan. Article 2924C simply does not apply in the present case where the firm is not a lender and the client is not a borrower, and neither the firm nor the client dispute that the third party lender charged twelve percent interest to the firm who furnished the security and borrowed the money solely for the benefit of the client.
I would allow the firm full recovery of all interest paid to the bank.
NOTES
[1] It is difficult to determine from the signed agreement whether Chittenden retained Carimi or the Carimi Law Firm. At times Carimi is mentioned and at other times the word, Attorneys, is used. Although the contract is ambiguous in this regard, for purposes of our analysis, it does not matter whether Chittenden retained Carimi or the Carimi Law Firm.
[2] It provided that Carimi's fee was contingent on a successful outcome. Should Chittenden's claim be resolved before suit was filed, Carimi was due 33 1/3% of the sums recovered together with costs and sums advanced; if a lawsuit was necessary, Carimi was due 40% of the sums recovered, together with costs and sums advanced.
[3] Although this opinion does not examine the line items that Carimi charged Chittenden, see infra note 6, we draw attention to our decision in Louisiana State Bar Ass'n v. Edwins, 540 So.2d 294 (La.1989), where we shed light on what costs an attorney may recoup. There we stated:

The settlement sheet indicates that [the client] was charged a larger fee than he was quoted ... and that he was also charged for items that must be paid for by the attorney as part of his overhead in the absence of a prior agreement by the client in the employment contract. For example, [the client] was charged $893.61 for computer-aided legal research in connection with a potential worker's compensation claim. A client who has retained a lawyer on a contingent fee basis may be billed for computer-aided research only when the fee agreement explicitly provides such costs will be billed, the agreement includes a detailed and complete explanation of the nature of the computerized research, and the client consents. ABA/BNA Lawyers' Manual on Professional Conduct, Ethics Opinions 1980-1985, 901:3001 and 901:7517.
Edwins, 540 So.2d at 302-03.
We further note that in its amicus curiae brief to this Court, the Louisiana Trial Lawyers Association ("LTLA") stated that its position is that costs of litigation do not include normal overhead items and that it is improper to recover such items as costs over and above the contingency fee.
[4] Carimi has a line of credit with Regions Bank, formerly Delta Bank & Trust, that was used to fund litigation expenses. The bank charges Carimi 12% simple interest and bills interest monthly on the outstanding daily balance.
[5] It appears that Chittenden's new counsel was able to settle his tort claim for $1.35 million. All or part of these funds, the record is not clear, was placed into the court registry for distribution after various claims to the funds were adjudicated.
[6] Because the Chittendens voluntarily paid these funds and have not made an issue of these charges in this writ application, we need not determine whether these advances fit within the restricted criteria of Louisiana State Bar Assn. v. Edwins, 329 So.2d 437 (La.1976) and the particular provisions of Chittenden's contract with Carimi.
[7] Not at issue before us is a dispute over $8,900 that Carimi advanced to Chittenden for a medical procedure that Dr. Fournet performed.
[8] DR 5-103(B) provided:

While representing a client in connection with contemplated or pending litigation, a lawyer shall not advance or guarantee financial assistance to his client, except that the lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and presenting evidence, provided the client remains ultimately liable for such expenses.
[9] The Montana Rules of Professional Conduct R.1.8 recognize this fact when it provides, in part, that "a lawyer may, for the sole purpose of providing basic living expenses, guarantee a loan from a regulated financial institution whose usual business involves making loans if such loan is reasonably needed to enable the client to withstand delay in litigation that would otherwise put substantial pressure on the client to settle a case because of financial hardship rather than on the merits, provided the client remains ultimately liable for repayment of the loan without regard to the outcome of the litigation and, further provided that neither the lawyer nor anyone on his/her behalf offers, promises or advertises such financial assistance before being retained by the client." (Emphasis added). But see Sims v. Selvage, 499 So.2d 325, note 1 (La.App. 1 Cir.1986) for commentary and criticism of Edwins.
[10] Our granting of the writ now before us has prompted us to call for the formation of a committee to study the revision of Rule 1.8(e), regarding financial assistance to clients. Therefore, this opinion will not revisit Edwins and will not resolve the issue of the propriety of client advances during litigation.
[11] The Annotated Model Rules, in the section dedicated to Rule 1.8(e), states that "Rule 1.8(e) prohibits a lawyer from providing financial assistance to clients" (emphasis added) except in the limited cases described in the rule. The annotated Model Rules also list a number of cases from various jurisdictions including, Florida, Kansas, Maryland, Mississippi, and Oklahoma, which hold that it is improper for an attorney to advance funds to their client. See, e.g., Florida Bar v. Rue, 643 So.2d 1080 (Fla.1994); In re Farmer, 263 Kan. 531, 950 P.2d 713 (1997); Attorney Grievance Comm'n v. Engerman, 289 Md. 330, 424 A.2d 362 (1981); Mississippi Bar v. Attorney HH, 671 So.2d 1293 (Miss.1995); State ex rel. Oklahoma Bar Ass'n v. Smolen, 837 P.2d 894 (Okla.1992). In addition, a number of states including Alabama, California, Minnesota, Montana, North Dakota, Texas, and Vermont have modified their version of Rule 1.8(e) to include a third paragraph which sets specific guidelines for client advances. For example, the rule has been modified to include the right of the attorney to guarantee a loan from a financial institution for his client. Montana Rules of Professional Conduct R.1.8.
[12] An additional argument that the Chittendens make, namely that the interest charged is usurious because of Carimi's failure to take Leap years into consideration in his interest computations, is rendered moot because of our disposition of this case.
[13] Supra at page 6.
[14] Rule 1.4 provides: "(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information. (b) The lawyer shall give the client sufficient information to participate intelligently in decisions concerning the objectives of the representation and the means by which they are to be pursued, to the extent the client is willing and able to do so."
[15] Using $10,000 as an example of principal advanced in year one, Martin explained that a ten percent (10%) APR would result in an interest charge of $1,000. If Carimi paid off that $1,000 interest charge from his line of credit, he would add that $1,000 to the $10,000 outstanding principal. Interest on the second year would then be calculated on $11,000 (the initial principal plus the interest paid in year one from the line of credit).
[16] "The relation of attorney and client is one of special confidence and trust and the dignity and integrity of the legal profession demand that the interests of the client be fully protected. Moreover, without public confidence in the members of the legal profession which is dependent upon absolute fairness in the dealings between attorney and client, courts cannot function in the proper administration of justice. Inherent in the relationship between attorney and client is the fact that the client must rely almost entirely upon the good faith of the attorney who alone can make an informed estimate of the value of the client's legal right and of the expense and effort necessary to enforce it." Saucier v. Hayes Dairy Products, Inc., 373 So.2d 102, 111 (La.1978) (Dennis, J., dissenting from original opinion).
[17] Although Carimi may not have advised Chittenden each time during their relationship of almost two years that the line of credit was accessed, the evidence shows that Chittenden's actions vis-á-vis, receiving advances for minimal living expenses and the like, shows that he was well aware that Carimi was providing funds for client use. Viewing the RPC with reason, Edwins, 329 So.2d 437, and Succession of Wallace, 574 So.2d at 360, we find that Carimi did not fail to keep his client informed.
[18] See also infra page 16 for further comment on this aspect of the litigation.
[19] We caution, however, that in this instance Carimi did not advance his personal funds, and instead made these loans at a financial institution in which he did not have a financial interest. See G. Fred Ours & William N. King, Advancing Funds to a Client with Interest, 43 La. B. J. 578 (1996), for a discussion of how use of personal funds or advancing funds from an institution that is either owned or controlled by the lawyer or the law firm may violate the RPC.
[20] RPC Rule 1.8, Comment (1) specifies that "all transactions between the client and lawyer should be fair and reasonable to the client."
[21] We further note that we choose not to follow Opinion 95-055 of the Louisiana State Bar Association Ethical Advisory Service Committee ("Ethical Advisory Service") which found that an attorney may not charge interest on client advances for costs, expenses, and other purposes. Its objection, based upon RPC Rules 1.4 (Communication) and 1.8 (Conflict of Interest: Prohibited Transactions), have been fully explored in this decision. We likewise find that we are not bound to follow the decision of Evans v. Cal Dive Intern'l, Inc., 1998 WL 799234 (E.D.La. 1998) which disallowed interest on the weight of Opinion 95-055 of the Ethical Advisory Service. Although the holdings of federal courts are persuasive and are entitled to much respect, we will not follow them in the face of positive jurisprudence from this Court. Hinchee v. Long Bell Petroleum Co., 235 La. 185, 103 So.2d 84 (1958).
[22] Our present version of LA. CIV.CODE ANN. art. 2924C(1) was taken directly from art. 1907 of the 1804 Code Napoleon. The article originally read in part: "Le taux de l'intérêt conventionnel doit être fixé par écrit." CODE CIVIL [C.Civ.] art. 1907(Fr.) (1804).
[23] The article also contains a business exception to the general rule concerning the amount of interest and the writing requirement. The provision reads:

D. The provisions of this Article do not apply to a loan made for commercial or business purposes or deferring payment of an obligation for commercial or businesses purposes.
LA. CIV.CODE ANN. art. 2924 D.
This provision does not apply to the transaction between Chittenden and Carimi because Chittenden was borrowing money for his personal expenses including medical bills and living expenses. Under Jefferson Door Co. v. Lewis, 713 So.2d 835 (La.App. 5 Cir.1998), a loan is personal in nature if the debtor gives personal objective representations that the money being borrowed is being borrowed for personal usage. In this case, Chittendens borrowed money from Carimi, with the knowledge of Carimi, for his personal living expenses and medical bills. We further note that at least one federal district court has opined that lawyers who extend credit and interest to clients are not subject to the either the Equal Credit Opportunity or Truth in Lending Acts. Reithman v. Berry, 98-5031 (E.D. Pa. 9/15/00).
[24] LA. CIV.CODE ANN. art. 7 provides:

Persons may not by their juridical acts derogate from laws enacted for the protection of the public interest. Any act in derogation of such laws is an absolute nullity.
[25] LA. CIV.CODE ANN. art.2001 provides:

Interest on accrued interest may be recovered as damages only when it is added to the principal by a new agreement of the parties made after the interest has accrued.
[26] Should the trial court find it necessary, it may wish to appoint an expert to aid it in this computation. See LA.CODE CIV. PROC. ANN. art. 373.
[27] We again call attention to note 19 supra in which we reminded the bar that the charging of interest on personal funds that a lawyer advances violates RPC 1.8 which prohibits an attorney from acquiring an additional proprietary interest in the litigation.
[28] LA. CIV.CODE art. 3 provides:

Custom results from practice repeated for a long time and generally accepted as having acquired the force of law. Custom may not abrogate legislation.